## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## GREENBELT DIVISION

**RORY D. WHITE**

10553 Crabtree Drive

Jonesboro, GA  30238

**Plaintiff**

-vs-

**CITY OF HAGERSTOWN**

SERVE:

       Registered Agent

       Donna E. Spickler

       1 E. Franklin Street

       Hagerstown, MD  21740

And

**OFFICER McKAY #5086**
**OFFICER JOHN DOE 1**
**OFFICER JOHN DOE 2**
**OFFICER JOHN DOE 3**
**OFFICER JOHN DOE 4**
**Of the Hagerstown Police Department**
50 Burnhans Blvd
Hagerstown, Maryland 21740

**Defendants**

**Complaint for a Civil Case**
(42 U.S.C. § 1983 and 28 U.S.C. §
1332; Diversity of Citizenship)

Case No.8:18-cv-3232

JURY TRIAL DEMANDED

**COMPLAINT**

The Plaintiff, Rory D. White, through his attorneys, Eisler Hamilton, LLC, and M. Christina Hamilton, Esquire., files this Complaint against Officer McKay #5086 ("**McKay**"), Officer John Doe 1-4, (collectively "**HPD Defendants**") and the City of Hagerstown ("**City**"), and in support of this Complaint states the following:

## <u>NATURE OF THE ACTION</u>

The Plaintiff brings this suit against the HPD Defendants, individually and in their respective official capacities for the excessive use of force, unlawful detention, as a result of the October 17, 2015, when the Plaintiff, an adult free from any intoxicating substances and not suffering from any mental illness,  refused medical treatment by the Emergency Medical Services ("**EMS**") summoned by the HPD Defendants during a purported domestic call in which no charges were filed, no officer was at risk of immediate harm, and no crime was tasered, restrained, and involuntarily committed to the Emergency Department in the Meritus Medical Center ('**MMC**") located in Hagerstown, Maryland pursuant to an unlawfully obtained Emergency Petition.

The Plaintiff brings this suit against the City of Hagerstown for its policy and custom of using Emergency Petitions, and non lethal weapons such as tasers against individuals to gain compliance of individuals who are suspected of being under the influence of drugs or alcohol or who may be suffering from a mental illness, who are not under arrest,  and who are not a danger to themselves or others.  The Plaintiff believes that the implementation of these policies to gain compliance of individuals without proper training has led to several incidents since 2013 involving the Hagerstown Police Department that in one instance caused injuries to a minor, and contributed to two deaths.

**JURISDICTION AND VENUE**

1.  This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) and 42 U.S.C. §1983.  This Court has personal jurisdiction over the Defendants Hagerstown and McKay who are reside in Washington County, Maryland.  Plaintiff also brings this action under the Fourth and Fourteenth Amendments of the United States Constitution.

2.  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 (b). Venue is proper as the majority of necessary witnesses reside in this Judicial District.  Venue is proper as the location of the incident.  This venue represents the most convenient forum for all parties.

**PARTIES**

3.  Plaintiff, Rory D. White ("**White**") is an individual who currently resides in Clayton County, Georgia, but resided in Hagerstown, Maryland at the time of the incident.

4.  The City of Hagerstown ("**City**") is a municipal corporation.  At the time of the events alleged herein, the City maintained and was legally responsible for the administration of the Hagerstown Police Department ("**HPD**") which operates and administers a set of law enforcement policies, practices, and customs which include the hiring, training and supervision of its police officers.  The City is liable for the acts committed by its agents.

5.  The City is the employer of HPD and HPD is an agent of the City.

6.  The HPD Defendants are sued in both their individual and official capacities.

7.  The Defendant McKay is upon information and belief, is a citizen and resident of Washington County, Maryland.  At all times alleged herein, he was a duly sworn police

officer and public official employed by the HPD and was acting within the scope of his employment.

8.   In his individual capacity, McKay's actions herein were grossly negligent, malicious, wanton, and/or done with a reckless disregard for the rights of others.

9.   John Doe 1, 2, 3, and 4, upon information and belief are all citizen and residents of Washington County, Maryland.   At all times alleged herein, they were all duly sworn police officers and public officials employed by the HPD and were acting within the scope of his employment.

10. In their individual capacity, John Doe 1, 2, 3, and 4's actions herein were grossly negligent, malicious, wanton, and/or done with a reckless disregard for the rights of others.

## STATEMENT OF FACTS COMMON TO ALL COUNTS

11. At all times relevant to this Complaint, Plaintiff, was over 18 years old, and was not under the influence of drugs or alcohol, nor suffering from any mental illness that could impair his ability to refuse or give his informed consent to medical treatment.

12. In evening of October 17th, 2015, members of HPD namely, McKay, and John Doe 1-4, were called to 1061A Noland Avenue,  Hagerstown, Maryland 21740 after receiving a call for a possible domestic dispute.

13. Upon arrival, the HPD Defendants entered the home of Plaintiff, Rory White and his wife, Neisha White, the Plaintiff's step son and step daughter, Neisha's children from a previous relationship, the Plaintiff's daughter, and a friend of the step daughter.

14. According to Plaintiff and the minor children, Neisha became upset when the Plaintiff had returned home from work with new shoes for Neisha's the children.  Neisha

wanted Plaintiff to give her his entire paycheck because Neisha purportedly did not believe the purchase of the shoes was necessary.

15. Neisha asked the Plaintiff to leave the home, and when Neisha's son intervened on Plaintiff's behalf, Neisha called HPD to have the Plaintiff removed from the home notwithstanding that at the time of the call to HPD Plaintiff was neither aggressive nor threatening.

16. According to Plaintiff and other witnesses, the HPD Defendants arrived at the Home and made contact with both Plaintiff and Neisha.  Initially the Plaintiff and Neisha were interviewed separately until. Neisha advised within earshot of the Plaintiff that Plaintiff had done nothing wrong and that she just wanted the Plaintiff to leave.

17. The Plaintiff, Neisha, and the stepson were then brought into the living room and the Plaintiff was asked to sit down on the sofa while other members of HPD interviewed Neisha.

18. While the Plaintiff remained on the sofa, upon information and belief, Neisha advised the HPD Defendants that Plaintiff may be under the influence of drugs, namely phencyclidine ("**PCP**") in effort to have him removed from the home.

19. The Plaintiff vehemently denied that the Plaintiff was under the influence of any drugs or alcohol.

20. The Plaintiff was cooperating with the HPD Defendants during this initial interview and appeared both calm and sober.

21. The Plaintiff was not threatening acts of violence, was not sweating or exhibiting other symptoms of PCP ingestion such as:  numbness, sense of euphoria, problems concentrating, slurred speech, loss of motor coordination, misperceptions of strength,

speed, or invulnerability, hallucinations, breathing problems, rapid eye movements, blank stares, failure to respond to stimulation, and did not display superhuman strength.

22. Notwithstanding McKay's failure to observe any of these symptoms, McKay summoned EMS to evaluate the Plaintiff's mental and physical health.

23. When EMS arrived at the home, McKay advised Plaintiff that the Plaintiff needed to go outside to be evaluated by EMS because Neisha told McKay that Plaintiff may have smoked PCP.

24. Plaintiff insisted that the he had not ingested PCP nor any other drug, and therefore, Plaintiff did not require medical attention.

25. McKay advised that he was directing the Plaintiff to be examined by EMS and again, Plaintiff refused medical treatment by EMS as it was unnecessary.

26. Without cause or provocation, the HPD Defendants ordered the Plaintiff to get down on the ground and the Plaintiff asked if he was being arrested.

27. The HPD Defendants present advised that the Plaintiff was not going to be arrested and that EMS just needed to check him out.  Again, the Plaintiff refused and was pulled down to the ground by several of the HPD Defendants who had entered the home. While being restrained, the HPD Defendants shot Plaintiff in the back with a taser, and then sat on the Plaintiff to further restrain him.

28. While the Plaintiff was on the ground face down, the Plaintiff was tasered a second time while he was restrained.

29. When the Plaintiff asked why the second taser was fired, and the officer who was sitting on top of him, John Doe 1, said that he did not know why the Plaintiff was being tasered again.

30. Neisha and the other family members who witnessed the HPD Defendants shooting the taser twice at the Plaintiff who was neither hostile or combative and screamed at the officers to get out of the house and leave the Plaintiff alone.

31. The HPD Defendants then physically restrained both Neisha and K., Neisha's 17 year old son to prevent Neisha and K from rendering aid to the Plaintiff.

32. After being tasered twice, the Plaintiff who was in great deal of pain, was forced into the ambulance by the HPD defendant and physically restrained with the taser barbs still in the Plaintiff's back.

33. Plaintiff feared for his life and truly believed that the police were going to bring him to different location to continue their assault, a fear that was magnified by the effects of the taser as well as the physical restraints.

34. At no time was Plaintiff placed under arrest nor did the HPD Defendants discover any drugs or contraband on his person.

35. At no time was a weapon displayed nor did any member of the household fear that Plaintiff was a danger to them or a danger to himself, a fact that was repeated numerous times to the HPD Defendants.

36. Notwithstanding that Plaintiff had denied being under the influence of PCP, and Plaintiff exhibited no signs of PCP ingestion, McKay told EMS personnel that Plaintiff had smoked PCP and that McKay was requesting a Petition for Emergency Evaluation ("**Petition**").

37. Plaintiff was brought to the Emergency Department of Meritus Medical Center at 11116 Medical Campus Road, Hagerstown, MD  21742.

38. As a direct result of McKay's Petition and false statements regarding the

Plaintiff's alleged PCP ingestions, the Plaintiff was first physically restrained, then chemically restrained, and held against his will for almost 12 hours.

39. Without his consent based and based on McKay's statements in the Petition, MMC physicians drew blood and performed numerous tests including a 13 drug toxicology screening.

40. According to hospital records, all tests were unremarkable and negative for drugs or alcohol.

41. After submitting to a mandatory psychiatric evaluation, the Plaintiff was determined to neither be a risk to himself or others and was discharged at on October 18, 2015 at approximately 6:15 a.m.

42. No criminal charges were filed against Plaintiff as a result of this incident.

43. Immediately after returning home, Plaintiff began experiencing shortness of breath, high heart rate, and difficulty sleeping.

44. A few days after the incident, the Plaintiff had severe chest pains while remembering the fear and pain he felt while being tasered and brought against his will.

45. Plaintiff feared he was having a heart attack and called 911. For reasons that remain unclear, the same HPD Defendants appeared before EMS arrived, and began taunting the Plaintiff about the October 17, 2018 incident and making light of his distress.

46. The Plaintiff was again brought to the MMC, this time voluntarily, and upon information and belief, released after the physicians determined that the symptoms were most likely induced by stress.

DB04/0837375.0002/11631043.1  CR09

## COUNT I – 42 U.S.C. §1983 Excessive Force,
## HPD Defendants McKay, and John Doe 1-4

47. Plaintiff realleges and incorporate herein by reference the allegations contained in the above-referenced paragraphs 1-47.

48. 42 U.S.C. §1983 ascribes civil liability for the deprivation of any rights,privileges, and immunities afforded to individuals by the United States Constitution, the laws of the United States, and the State of Maryland.

49. At all times relevant to the events herein, the HPD Defendants were acting under color of law and considering their knowledge and lack of knowledge of the circumstances, used an unreasonable, unnecessary amount of force to subdue and/or control Plaintiff, and in using more or improperly dangerous force than reasonably necessary in contravention of accepted law enforcement standards related to the use of force in gaining control over unarmed individuals.

50. In inflicting greater force than reasonably necessary to control or subdue Plaintiff, the HPD Defendants acted with deliberate indifference to Plaintiff's Fourth Amendment right to be free from unreasonable seizure of his person, and his Fourteenth Amendment right to substantive due proves precedent to the imposition of punishment in response to suspected criminal activity.  (Collectively referred to as "**Constitutional Rights**") These Constitutional Rights are clearly established and known to all law enforcement officers.

51. Specifically, the HPD Defendants used excessive force on the Plaintiff when there was neither probable cause nor a reasonable basis to do so.

52. Defendants, HPD Defendants are not entitled to qualified immunity for the constitutional violations alleged herein, because no reasonable officer, acting in the circumstances and with the knowledge or lack of knowledge of McKay and John Does 1-

4, would have inflicted the same type, quantity, and level of force upon the Plaintiff as inflicted by the HPD Defendants.

53. The HPD Defendants deprived the Plaintiff of his right to refuse medical treatment under the Fourth Amendment, and that this right was clearly established.

54. There was no need for the application of force since the Plaintiff was not under arrest, and was soberly exercising his right to decline medical treatment.

55.   The Plaintiff was tasered twice in the back while the Plaintiff was already being restrained by 5 members of HPD  in order to force the Plaintiff to accept medical treatment.

56. The employment of the taser was wholly unnecessary and without justification and should not be used to force compliance with medical treatment when the Plaintiff had soberly refused treatment, was in his own home, was not injured, was not an immediate threat to others and was not under arrest.

57. The force was not applied in good faith to either maintain or restore discipline.

58. The Plaintiff did not pose an immediate threat to the safety of the officer, others, or himself, a fact that was known to the HPD Defendants when they first arrived on the scene by family members who advised that the Plaintiff had done nothing wrong.

59. At all times relevant hereto, the HPD Defendants applied excessive force without legal justification, cause, or excuse.

60. The HPD Defendants excessive use of force, and corresponding deliberate indifference to Plaintiff's Constitutional Rights proximately caused Plaintiff's injuries and damages.

61. Plaintiff is entitled to recovery compensatory damages, punitive damages, and all

other damages in an amount in excess of $75,000.00.

## COUNT II 42 U.S.C. §1983 Unlawful Seizure/Detention, HPD Defendants McKay and John Doe 1-4

62. Plaintiff realleges and incorporate herein by reference the allegations contained in the above-referenced paragraphs 1-61.

63. At all times relevant to the events herein, the HPD Defendants, McKay and John Doe 1-4, were acting under color of law and considering their knowledge or lack of knowledge of the circumstances, unlawfully seized the Plaintiff in his home without probable cause by obtaining an Emergency Petition which deprived the Plaintiff of his liberty through the Plaintiff's involuntary confinement at MMC for over ten hours through the use of chemical and physical restraints.

64. Plaintiff's involuntary confinement was analogous to a criminal arrest and should have been supported by probable cause.

65. The Petition on its face is completely void of any facts sufficient to put any reasonable police officer under similar circumstances that the Plaintiff was either a danger to himself or others, or that the Plaintiff required an emergency psychiatric evaluation.

66. The Petition states that the Evaluee presents a danger to life or safety of the Evaluee and others because:  "He is talking outside of his head saying things like Everyone is going to die tonight, It's the end of tie.  You are guys are going to try and kill me.." See Emergency Petition **Exhibit 1**

67. Curiously, McKay left blank Question 9 which asks the Petitioner to describe the behavior which led the Petitioner to conclude that the Evaluee has a mental disorder.

68. McKay signs his name but provides the Plaintiff's birthdate, October 23, 1983 as

the date McKay executed the Petition.

69. McKay signs the Officer's Certification certifying that he is a municipal or local police officer and that McKay has personally observed the Evaluee's behavior, notwithstanding that no such behavior was identified.  McKay also does not check the box as to whether or not it was McKay's own observations or other information that provides Petitioner's reason to believe that the Evaluee has a mental disorder and presents a danger to the life or safety of others.

70. The indifference in which McKay completes the Petition is clearly symptomatic of the indifference the HPD Defendants have for the Constitutional Rights afforded to Plaintiff who, according to the Petition, displayed no violent or erratic behavior, and who made no overt acts of violence against either the Plaintiff or others.

71. The description of what behavior caused the seizure of an sober individual sitting on a sofa in his own home is information that any reasonable officer in a similar circumstance would need to observe or consider before applying force, or restrains to effectuate an involuntary confinement.

72. Without such a description, the HPD Defendants set into motion the confinement of a sober adult who committed no crime, was in his own home, and who elected not receive medical treatment because it was not necessary.

73. The HPD Defendants did not have probable cause to confine the Plaintiff because the Plaintiff did not ingest PCP, did not have an altered mental state, and did not display any symptoms of either mental illness or substance abuse that would necessitate either involuntary commitment or an emergency psychiatric evaluation.

<u>COUNT III 42 U.S.C. §1983 Defendant City of Hagerstown</u>

74. Plaintiff realleges and incorporate herein by reference the allegations contained in the above-referenced paragraphs 1-73.

75. The HPD Defendants acted pursuant to a municipal policy and custom and police policy and procedure that was calculated to and did deprive the Plaintiff of rights and privileges protected by state and federal law.

76. The City's policy for the use of Less Lethal Weapons is a policy that deprives individuals of their Constitutional Rights by allowing Conducted Electrical Weapons (**CEW**) also known as tasers to "control individuals whose actions are reasonably expected to intentionally harm themselves or others."  See Chapter 14, **Exhibit 2**

77. In this jurisdiction, a police officer may only use serious injurious force, like a taser, when an objectively reasonable officer would conclude that the circumstances present a *risk of immediate danger*.

78. The City's policy that taser can be used to "control persons whose attempt to prevent a lawful arrest or custody puts officers and themselves at risk of physical injury" deprives individuals of their Constitutional Rights.

79. This policy standing alone or in the context of an Emergency Petition is a deprivation of an individual's constitutional right because it fails to provide or instruct that taser use is only reasonable force in response to resistance that raises a risk of *immediate danger to the officers* and as such its application against the Plaintiff was unconstitutional as an excessive use of force.

80. The City's policies also do not differentiate between the use of force when an

individual is only threatening harm to himself and when an individual is threatening harm

others.

81. Consequently, the City's policies fail to provide or instruct that when the seizure's

sole justification is preventing harm to the subject of the seizure, the City can have little

interest in using less lethal force like a taser to effect that seizure and therefore tasers

should not be used to gain compliance of an individual who only presents a risk of harm

to himself.

82. As a result of these policies, there have been several incidents in which poorly

trained members of the HPD have used purportedly less lethal weapons such as pepper

spray, tasers, and physical restraints on individuals who appeared to be only a risk to

themselves and not an immediate risk to police officers.  On April 16, 2015, Darrell

Lawrence Brown, died after being shot with a taser twice and restrained by 5 members of

HPD.  The medical examiner concluded that Brown suffered from cardiac arrest after being

based twice while in an excited delirium.  Brown was 31 years old when he died.  On June

24, 2013, James Edward Adell, 34 years old, suffered cardiac arrest while being restrained

by members of the HPD who according to witnesses sat on his arms and legs until EMS

arrived. Adell exhibited symptoms of a drug induced excited delirium such as sweating

profusely, elevated body temperature, and abnormal behavior.  Currently pending in this

court is *B.N.S. v. Brito, el al*, Case No.17-cv-02670, infamous for the police body cam

videos which allegedly show a 15 year old girl who refused medical attention after she was

involved in an accident while riding her bike, detained against her will, sprayed multiple

times in the face with pepper spray, and forced into an HPD car where she was again

sprayed in the face.

83. The City's policy allows police to also use Less Lethal Weapons when taking

custody of an individual under an Emergency Petition like the Plaintiff.  See Chapter 62,

**Exhibit 3**

> If an officer anticipates a violent or potentially violent person will be taken in to
> custody, the officer shall attempt to have less lethal weapons present before
> custody is attempted.  Such weapons will be deployed according to training and
> Department policy and procedures.

84. The Plaintiff, Adell, Brown, and B.N.S. suffered injuries or died in incidents in

which members of HPD used non-lethal force pursuant to the City's policies which are

contrary to laws of this jurisdiction and serve to deprive individuals of constitutional

rights.

85. The City was negligent in its promulgation of policies on the use of Less Lethal

Weapons, Arrest, and use of Emergency Petition, and its failure to establish

reasonable procedures, including the training of officers in methods, techniques, and

approaches designed to prevent the excessive use of force in responding to situations

involving emotionally or mentally disturbed and/or restrained individuals, as well as to

prevent the unnecessary confinement of noncombative individuals of mentally disturbed

individuals. See Chapter 12, **Exhibit 4**, Chapter 24 **Exhibit 5**, and See Chapter 72,

**Exhibit 6**

86. The violations of the generally accepted law enforcement custom and practices in

this situation, namely, the use of excessive force and the illegal involuntary confinement

of the Plaintiff, were direct and foreseeable results of City's policies enumerated above as

well as inadequate supervisory and training practices on the part of HPD.  City also failed

to train their employees on the proper use and implementation of the Emergency Petition,

how to properly restrain a mentally disturbed person, when and how to properly use a taser, and the circumstances warranting a taser various other restraint and arrest techniques.

87. The City through the acts and omission of its employees and McKay and John Does 1-4, acted with deliberate indifference to individuals such as the Plaintiff who are suspected to have an impaired ability to control their behavior ("**Impaired Persons**").

88. These actions by McKay and John Does 1-4, were pursuant to a municipal policy and custom and police policy and procedures and were calculated to and did deprive Plaintiff of rights and privileges protected by state and federal law, including 42 U.S.C. §1983.

89. The City and the HPD Defendants acted with deliberate indifference to the Constitutional Rights of individuals who are either the subject of an Emergency Petition, or individuals alleged to be impaired by mental illness or substance.

90. The City's policies enumerated above, as well as inadequate supervisory and training practices on the part of HPD in the areas of the proper use of the Emergency Petition, how to properly restrain a mentally disturbed person, when and how to properly use a taser, the circumstances warranting taser use, various other types of restraint and arrest techniques, are failures of policy, widespread custom and practice.

91. These systemic failures or failures as alleged above directly and proximately caused the injuries the Plaintiff suffered as result of the HPD Defendants' application of excessive force, the issuance of an Emergency Petition without probable cause, as well as the injuries sustained by the Plaintiff due to his unlawful confinement, restraint, and sedation undertaken pursuant to the Emergency Petition.

DB04/0837375.0002/11631043.1  CR09

92. The City as a result of these policies, practice, and the deaths of Adell and Brown, knew of, ratified, condoned, and encouraged the Defendant's conduct described in Counts I and Counts II.

93. Due to the systematic, unconstitutional training practices, and policies alleged herein, the Defendants are liable for the Plaintiff's damages.

94. The Defendants actions were undertaken willfully, wantonly and with a reckless disregard for the Plaintiff's rights entitling the Plaintiff to compensatory and punitive damages in excess of $75,000.


WHEREFORE, Plaintiff prays for judgment and relief on his causes of action as follows and as is appropriate:

A.  Judgment entered against City of Hagerstown, Officer McKay, and John Does 1-4, individually and in the alternative, joint and severally, for an amount to be determined at trial but anticipated to be in excess of $75,000;

B.  Costs of this suit, including reasonable expert fees;

C.  Punitive Damages;

D.  Pre- and post-judgment interest; and

E.  Such other and further relief as this Court may deem necessary or appropriate.


**JURY DEMAND**

Plaintiff demands a trial by jury and all issues so triable.

## Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.


Dated:  October 17, 2018                    Respectfully submitted,


                                            EISLER HAMILTON, LLC


                                            By:   /s/ Maria Christina Hamilton
                                                 Maria C.G. Hamilton, Bar No. 16484
                                                 Alan D. Eisler, Bar 11524
                                                 1 Research Court., Suite 450
                                                 Rockville, MD 20850
                                                 Phone: (240) 283-1164
                                                 Fax: (240) 283-1179
                                                 Email:chamilton@e-hlegal.com
                                                 aeisler@e-hlegal.com
                                                 Attorneys for Rory D. White